FIRST DISTRICT COURT OF APPEAL
STATE OF FLORIDA

_____

No. 1D15-3558

_____

REGINALD LEE BOOKER, III,

Appellant,

v.

STATE OF FLORIDA,

Appellee.

_____

An appeal from the Circuit Court for Escambia County.
J. Scott Duncan, Judge.

April 18, 2018

MAKAR, J.

Reginald Lee Booker, III, pled no contest to fleeing or attempting to elude a law enforcement officer and driving without a valid driver's license. His scoresheet reflected 20.4 sentence points, which by statute required that he be sentenced to a "nonstate prison sanction," which "is 'understood to mean probation, community control, or imprisonment in the county jail for up to one year.'" *Reed v. State*, 192 So. 3d 641, 645 (Fla. 2d DCA 2016) (citing *Jones v. State*, 71 So. 3d 173, 175 (Fla. 1st DCA 2011)). Section 775.082(10), Florida Statues (2018), says that "[i]f the total sentence points . . . are 22 points or fewer, the court *must* sentence the offender to a nonstate prison sanction." (Emphasis added). Because a "nonstate prison sanction" is mandated, Booker's maximum incarceration would be eleven months and thirty days in a county jail (i.e., up to a year or "11/30" in sentencing parlance) based upon his plea to the charges.

At the State's request, however, the trial judge increased Booker's punishment beyond the nonstate maximum, sentencing him to a four-year state prison term, based on his independent factual findings that Booker could present a danger to the public if subject only to a nonstate prison sanction. The authority for doing so—and the subject of this appeal—is the last sentence of section 775.082(10), which says: "However, if the court makes written findings that a nonstate prison sanction could present a danger to the public, the court may sentence the offender to a state correctional facility pursuant to this section."

The State acknowledged that it was "seeking an upward departure" from the maximum nonstate sanction the statute permitted. At the sentencing hearing, the State sought "prison time" due to Booker's "danger to the community," or, if the trial judge was "not willing to go beyond the guidelines," then "at least 11/30 county jail [time] followed by [a] significant amount of community control and probation." In response, the trial judge queried that "the State is actually seeking an upward departure is what you are telling me," to which the State responded: "Yes."

Booker's motion to correct his sentence claimed that the enhancement of his sentence was unconstitutional under the Sixth Amendment because the trial judge, rather than a jury, made the factual findings that were necessary to increase his punishment beyond the statutory maximum of a nonstate prison sanction to a state prison sanction, i.e., the four-year state prison term he received. *See Blakely v. Washington*, 542 U.S. 296 (2004); *Apprendi v. New Jersey*, 530 U.S. 466 (2000). This Court recently addressed the question of whether section 775.082(10) is *facially* unconstitutional in violation of the jury trial right discussed in *Apprendi* and *Blakely*. *Woods v. State*, 214 So. 3d 803, 805 (Fla. 1st DCA 2017) (en banc), *review dismissed*, SC17-955, 2017 WL 2264740 (Fla. May 24, 2017). We couldn't reach a consensus on that question, leaving for another day the question of whether the statute may be unconstitutional *as applied* in a specific case, which we now address.

### *Background*

The Florida Legislature, faced with budgetary challenges in

2

2009, sought to reduce the burden of prison expense on the Department of Corrections by mandating that specified, non-violent offenders, who score under twenty-two points on their criminal scoresheet, be sentenced to nonstate sanctions—thereby shifting incarceration of these offenders to county jails for a maximum of up to one year. *See Woods*, 214 So. 3d at 805 (citing Ch. 2009-63, § 1, Laws of Fla.; Fla. S. Comm. on Crim. & Civil Just. Approp., CS for SB 1722 (2009) Staff Analysis 2-3, 7 (April 6, 2009)). It added section 775.082(10), consisting of the following two sentences:

> (10) If a defendant is sentenced for an offense committed on or after July 1, 2009, which is a third degree felony but not a forcible felony as defined in s. 776.08, and excluding any third degree felony violation under chapter 810, and if the total sentence points pursuant to s. 921.0024 are 22 points or fewer, the court *must* sentence the offender to a nonstate prison sanction. However, *if the court makes written findings that a nonstate prison sanction could present a danger to the public, the court may sentence the offender to a state correctional facility pursuant to this section.*

§ 775.082(10), Fla. Stat. (emphasis added). The last sentence, which was used to enhance Booker's sentence to a state prison sanction, is the focus of the Sixth Amendment claim at issue.

Combined with the Fourteenth Amendment's prohibition that liberty may not be taken without "due process of law," the Sixth Amendment's declaration that "the accused shall enjoy the right to a speedy and public trial, by an impartial jury" in "all criminal prosecutions" "indisputably entitle[s] a criminal defendant to 'a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt.'" *Apprendi*, 530 U.S. at 476-77 (quoting *United States v. Gaudin*, 515 U.S. 506, 510 (1995)). The Supreme Court, in extolling the centuries-old foundation of the jury trial right, explained that:

> "[T]o guard against a spirit of oppression and tyranny on the part of rulers," and "as the great bulwark of [our] civil and political liberties," 2 J. Story, Commentaries on the

3

Constitution of the United States 540-541 (4th ed. 1873), trial by jury has been understood to require that "*the truth of every accusation,* whether preferred in the shape of indictment, information, or appeal, should afterwards be confirmed by the unanimous suffrage of twelve of [the defendant's] equals and neighbours. . . ."

*Apprendi*, 530 U.S. at 477 (quoting *Gaudin*, 515 U.S. at 510-11) (citing 4 W. Blackstone, Commentaries on the Laws of England 343 (1769)). It further explained why the "beyond a reasonable doubt" standard applies.

Equally well founded is the companion right to have the jury verdict based on proof beyond a reasonable doubt. . . . "'It is now accepted in common law jurisdictions as the measure of persuasion by which the prosecution must convince the trier of all the essential elements of guilt.'" . . . [R]eliance on the "reasonable doubt" standard among common-law jurisdictions "'reflect[s] a profound judgment about the way in which law should be enforced and justice administered.'"

*Apprendi*, 530 U.S. at 478 (citations omitted). Given the "historic link" between the necessity of a jury's verdict beyond a reasonable doubt and the sentence imposed, and the "consistent limitation on judges' discretion to operate within the limits of the legal penalties provided," the Supreme Court has noted the "novelty of a legislative scheme that removes the jury from the determination of a fact that, if found, exposes the criminal defendant to a penalty *exceeding* the maximum he would receive *if punished according to the facts reflected in the jury verdict alone.*" *Id.* at 482-83 (emphasis added).

The central point of *Apprendi* and *Blakely* is that any fact in a judicial proceeding—excepting the fact of a prior conviction—that is used to increase a penalty for a crime beyond the relevant statutory maximum is unconstitutional because a jury, and not a judge, is entrusted with that responsibility under the Sixth Amendment. *See Apprendi*, 530 U.S. at 490 ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a

jury, and proved beyond a reasonable doubt."); *see also Blakely*, 542 U.S. at 304 ("When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts 'which the law makes essential to the punishment,' . . . and the judge exceeds his proper authority.") (citation omitted). When faced with upward departures in sentencing, the Florida Supreme Court has held likewise. *See Plott v. State*, 148 So. 3d 90, 95 (Fla. 2014) ("[W]e hold that upward departure sentences that are unconstitutionally enhanced in violation of *Apprendi* and *Blakely* patently fail to comport with constitutional limitations, and consequently, the sentences are illegal under rule 3.800(a).").

### *Application of Section 775.082(10), Florida Statutes*

Given the momentous role of the jury in our country's legal history, and the clarity of the stated principle in *Apprendi* and *Blakely* that judicial fact-finding is no substitute for jury fact-finding if used for sentencing beyond a relevant statutory maximum, we conclude that the last sentence of subsection (10) violates this principle as applied to Booker. It empowered precisely what *Apprendi* and *Blakely* condemn: giving a trial judge the power to make factual findings independent of the jury (here, about future public dangerousness) that are used to increase an offender's sentence beyond the maximum allowable by the "facts reflected in the jury verdict alone." *Blakely*, 542 U.S. at 303. As applied to Booker, the result is that, rather than be subject to a maximum of up to a year in a county jail, he is sent to state prison for four years—based solely on factual findings as to his potential for future dangerousness upon which only a judge, not a jury, has passed.

The Supreme Court's unequivocal language in *Blakely* drew a clear-cut line as to what constitutes the relevant statutory maximum sentence for Sixth Amendment purposes: it is the maximum sentence that could be imposed "*solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*" *Id*. The Supreme Court italicized this language to make an enduring point: the statutory maximum sentence is determined *solely* upon jury-verdict facts (or those admitted to by the offender).

5

For instance, in *Blakely*, the offender "was sentenced to more than three years above the 53-month statutory maximum of the standard range because he had acted with 'deliberate cruelty.'" *Id.* This was done even though the "facts supporting that finding were neither admitted by petitioner nor found by a jury." *Id.* In rejecting the State's argument that a higher statutory maximum was appropriate, the Supreme Court said:

> Our precedents make clear, however, that the "statutory maximum" for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant. . . .* In other words, **the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings**. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts "which the law makes essential to the punishment," . . . and the judge exceeds his proper authority.

*Id.* at 303-04 (citations omitted; italics in original, bold added). What's "relevant" for Sixth Amendment purposes is not the maximum sentence a statute may authorize with additional fact-finding; it is what may be imposed without the judge making her own findings.

Applying the bolded language of *Blakely* to this case, "the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts [i.e., five years of state imprisonment based on additional judicial findings of potential future dangerousness], but the maximum he may impose *without* any additional findings [i.e., up to one year in county jail]." A jury verdict alone does not authorize an enhancement of an offender's sentence beyond a nonstate sanction. That's because subsection (10) requires additional judge-made fact-finding about an offender's potential future dangerousness—upon which no jury ever passes—to make this enhancement. Stated differently, the only path to imposition of a state prison sanction that exceeds the statutory nonstate maximum is via judicial fact-finding with no

6

jury involvement or input in the process. To make this point, imagine if the trial judge sentenced Booker to four years in prison *without* making the additional factual findings of potential future dangerousness; he'd be reversed. Standing alone, a jury verdict— or an offender's plea—authorizes at most a nonstate sanction capped at up to one year in county jail, which is the "relevant" statutory maximum for *Apprendi* purposes.

The view that a jury's verdict alone—no matter the elements of the charged offense—authorizes a state prison sentence up to a maximum of five years[1] overlooks the clear language of Supreme Court precedent, and is based on two misconceptions. First, the current statutory framework must be analyzed as it is, not as it

---

[1] We disagree with the Fifth District that a jury verdict by itself authorizes a state sanction of up to five years of imprisonment, which it deems the relevant statutory maximum for *Apprendi* purposes. *Brown v. State*, 233 So. 3d 1262, 1264, 1265 (Fla. 5th DCA 2017) (Brown's "sentence [of three years in prison] was fully authorized by the jury verdict" and "the jury's verdict authorized the trial court to sentence Appellant to five years in state prison *before* the trial judge considered the additional findings contemplated by section 775.082(10)."). We cannot reconcile how a jury's finding of guilt on the petit theft charge in *Brown* authorized anything other than a nonstate sanction, future dangerousness not being an element of the jury's verdict. We also do not see how section 775.082(10) establishes a "formula" that contains "factors" that an *offender* must satisfy to avoid a state sanction. Offenders are not required to plead or qualify for a nonstate sanction; to the contrary, the Legislature has mandated that trial judges "must" impose one. And we cannot accept that section 775.082(10) as a whole "create[s] an entitlement to mandatory mitigation for those offenders who satisfy both criteria," i.e., less than 22 points and proof that they pose no public danger; thereby shifting the onus onto offenders to *disprove* to a trial judge's satisfaction that they pose a future danger to the public. *Id.* at 1264. Finally, we disagree that "Section 775.082(10) *never* increases an offender's sentence" and, instead, "reduces the sentence from a five-year maximum in state prison to a non-state sanction." *Id.* at 1265. We view it as operating in exactly the opposite way (as did the State in Booker's case).

7

existed prior to subsection (10)'s addition. Viewed this way, a jury verdict alone *would have permitted* up to a five-year sentence under the statutory framework that existed *before* subsection (10) was added in 2009. The penalty for a third-degree felony was capped at a state prison sanction of five years, which was the relevant "statutory maximum" for *Apprendi* purposes *at that time*. Subsection (10) markedly changed the status quo, however, by shifting incarcerative sentences of this broad category of felons to county jails, mandating that a trial judge "*must* sentence the offender to a nonstate prison sanction." A jury's verdict in the era before enactment of subsection (10) may have authorized up to five years in prison, but that same verdict post-enactment does not, without additional fact-finding by trial judges as to offenders' future dangerousness.

Second, the Legislature could have worded subsection (10) in a way that authorized a jury's verdict to permit a statutory maximum for *Apprendi* purposes of five years of imprisonment, but it would also have to concurrently allow for *downward* departures to lesser nonstate sanctions for non-dangerous offenders via additional judicial fact-finding to achieve its policy goals. It did not do so, for good reason, as the following illustration shows:

> If the total sentence points are 22 points or fewer, the court must sentence the offender to a state sanction up to five years. However, if the court makes written findings that a nonstate prison sanction would not present a danger to the public, the court may sentence the offender to a nonstate prison sanction pursuant to this section.

Under this type of statutory language, a jury verdict would authorize a state prison sentence up to five years, making it the relevant statutory maximum for *Apprendi* purposes. But rather than hold sporadic hearings where trial judges enhance the sentences of low-point offenders deemed to be potentially dangerous as currently occurs, this statute would require hundreds, if not thousands, of judicial fact-finding hearings annually to ferret out those offenders deemed to be *non-dangerous* to be sentenced to nonstate prison sanctions, creating a disruptive and expensive sentencing morass.

8

Put simply, section 775.082(10)'s enactment shifted the sentencing paradigm markedly, and in the process eliminated the ability of a jury verdict alone to impose a state prison sanction. Protection of the jury trial right does not hamstring the Legislature's ability to achieve its policy goals, however. For example, if section 775.082(10) required a jury—rather than a judge—to make factual findings about an offender's potential for future dangerousness, the check on personal liberty that the Sixth Amendment's right to a jury trial provides would be retained. A simple legislative fix might be to amend subsection (10) to say: ". . . if ~~the court~~ a jury makes written findings that a nonstate prison sanction could present a danger to the public, the court may sentence the offender to a state correctional facility pursuant to this section." Courts, except by rewriting a clearly-worded statute, cannot achieve this policy result.

As to Booker, the Sixth Amendment breach becomes evident because subsection (10) permitted the trial judge to "inflict[] punishment that the jury's verdict alone does not allow" via factual findings on future dangerousness that are not "essential to the punishment" of the underlying offense. *Blakely*, 542 U.S. at 296. What happened to Booker is no different from what happened in *Apprendi*, where the defendant's sentence was enhanced after an evidentiary hearing and based solely on independent judicial fact-finding under a preponderance of the evidence standard that Apprendi acted with racial bias. 530 U.S. at 471. Similarly, Blakely's sentence was enhanced based on judicial fact-finding that he acted with "deliberate cruelty" in the commission of his crime. *Blakely*, 542 U.S. at 298. That Booker's sentence was enhanced on a judicial finding of future dangerousness—rather than on racial bias or as being deliberate cruelty as in *Apprendi* and *Blakely*, respectively—matters not because in each situation the punishment inflicted is based on facts a jury's verdict alone would not allow. Imagine if section 775.082(10) were revised to say the following:

> If the total sentence points are 22 points or fewer, the court must sentence the offender to probation only. However, if the court makes written findings that: (a) the offender acted with racial bias; (b) the act committed was done with deliberate cruelty; or (c) probation could

9

present a danger to the public, the court may sentence the offender to a state correctional facility for up to five years.

Would there be any doubt it violates the Sixth Amendment? Subsections (a) and (b) violate *Apprendi* and *Blakely*, respectively, so why wouldn't subsection (c)? *Blakely* answered that question, stating:

> Whether the judge's authority to impose an enhanced sentence depends on finding a specified fact (as in *Apprendi*), one of several specified facts (as in *Ring* [*v. Arizona*, 536 U.S. 584 (2002)]), or *any* aggravating fact (as here), it remains the case that the jury's verdict alone does not authorize the sentence. *The judge acquires that authority only upon finding some additional fact.*

*Blakely*, 542 U.S. at 305 (emphasis added). As to Booker, the trial judge acquired the authority to enhance his sentence only upon making additional factual findings required by subsection (10), making clear that a sentence enhancement for potential public danger under (c) is the same type of enhancement of a sentence that *Apprendi/Blakely* condemn as constitutionally unacceptable.

Moreover, the claim that section 775.082(10) is a so-called "mitigation statute" that neuters the force of *Apprendi* and *Blakely* is not well-taken for numerous reasons. First of all, nothing in the statute "mitigates" a defendant's sentence; instead, it creates a process solely and exclusively for *enhancing* a defendant's sentence from a mandatory nonstate sanction to a state sanction based exclusively on judge-made factual findings as to future dangerousness. It is a one-way ratchet, always upwards, with no jury involvement whatsoever.[2]

---

[2] We disagree with the Fourth District's conclusion that subsection (10) "was a mandated mitigation of an otherwise *available* maximum penalty." *Porter v. State*, 110 So. 3d 962, 963 (Fla. 4th DCA 2013) (emphasis added). The maximum penalty of five years, however, is not "available" without the additional judicial fact-finding required under that subsection. We also disagree that subsection (10) gives trial courts "discretion . . . to

10

Indeed, the State, at sentencing, sought what it agreed was an "upward departure" in this case, which is how our supreme court characterizes subsection (10). *Bryant v. State*, 148 So. 3d 1251, 1258 (Fla. 2014) ("The practice of upward departure sentences was reinstated in 2009, when the Legislature enacted subsection (10) of section 775.082, Florida Statutes . . . ."). It bears emphasis that Florida's Criminal Punishment Code, enacted in the late 1990s:

> has, in almost every aspect, eliminated the "upward departure" of the former determinate guidelines sentencing schemes and replaced it with an indeterminate sentencing scheme in which the judge is free to sentence up to the statutory maximum without having to provide written reasons for doing so. . . . A statutory exception to indeterminate sentencing under the [Code] is found in section 775.082(10), Fla. Stat.

*See* 16 Fla. Prac., Sentencing § 6:48 (2017-2018 ed.); *see generally* Ch. 97-194, Laws of Florida (effective October 1, 1998). The Code, with subsection (10) as the only "upward departure" exception,[3] provides for indeterminate sentencing up to statutory maximums along with mitigation or downward departures under specified circumstance, an example being the "prison diversion program" by which "a court may divert from the state correctional system an offender who would otherwise be sentenced to a state facility by

*adhere* to the Criminal Punishment Code in lieu of the mandated mitigation[.]" *Id.* (emphasis added). Instead, we see subsection (10) as authorizing trial judges to *depart* from the mandatory nonstate prison sanctions that same subsection compels.

[3] In *Butler v. State*, 838 So. 2d 554, 556 (Fla. 2003), the supreme court held that when the statutory maximum sentence as provided in section 775.082 is "exceeded by the lowest permissible sentence under the code," the latter "becomes the maximum sentence which the trial judge can impose." Unlike here, no judge-imposed upward departure was at issue in *Butler*, only the harmonizing of sections 775.082 and 921.0024(2), to determine the maximum sentence permissible.

11

sentencing the offender to a nonstate prison sanction as provided [therein]." § 921.00241(2), Fla. Stat. (2018). In contrast to subsection (10), this type of sentencing statute, which allows diversion or reduction of a defendant's sentence based on judicial fact-finding as to specified ameliorative factors, avoids a Sixth Amendment problem because it works in the opposite direction of what *Apprendi* and *Blakely* condemn; it mitigates versus enhances a sentence based on facts not passed upon by a jury.[4] The Sixth Amendment protects a defendant from an enhanced sentence, not a reduced one, when based solely on additional judicial fact-finding.

In addition, the Supreme Court has already rejected arguments that section 775.082(10) is merely a "mitigation" statute with no Sixth Amendment implications. One argument is "that the jury need only find whatever facts the legislature chooses to label elements of the crime, and that those it labels sentencing factors—no matter how much they may increase the punishment—may be found by the judge." *Blakely*, 542 U.S. at 306. Applied here, the parallel argument is that a jury verdict, no matter what the

---

[4] In addressing this point, the Court in *Apprendi* said:

Finally, the principal dissent ignores the distinction the Court has often recognized . . . between facts in aggravation of punishment and facts in mitigation. . . . If facts found by a jury support a guilty verdict of murder, the judge is authorized by that jury verdict to sentence the defendant to the maximum sentence provided by the murder statute. If the defendant can escape the statutory maximum by showing, for example, that he is a war veteran, then a judge that finds the fact of veteran status is neither exposing the defendant to a deprivation of liberty greater than that authorized by the verdict according to statute, nor is the judge imposing upon the defendant a greater stigma than that accompanying the jury verdict alone. Core concerns animating the jury and burden-of-proof requirements are thus absent from such a scheme.

530 U.S. at 490 n.18.

elements of the underlying crime may be, thereby authorizes an increased sentence based on an offender's potential future dangerousness as determined solely by a judge under section 775.082(10). Concluding this type of argument leads to an "absurd result," the Court gave the example "that a judge could sentence a man for committing murder even if the jury convicted him only of illegally possessing the firearm used to commit it—or of making an illegal lane change while fleeing the death scene." *Id.*

The analog as applied to Booker is that the Legislature, by making an offender's potential future dangerousness a sentencing factor solely for the judge's determination, has removed the jury entirely from the fact-finding process upon which an enhanced sentence is based. Under these circumstances, where the jury is sidelined and judicial power garrisoned, the Court concluded that the "jury could not function as circuitbreaker in the State's machinery of justice if it were relegated to making a determination that the defendant at some point did something wrong, a mere preliminary to a judicial inquisition into the facts of the crime the State *actually* seeks to punish." *Id.* at 306-07. This point is reinforced here: the State's invocation of subsection (10) triggers judge-only fact-finding without jury involvement even though far more serious punishment is to be inflicted. It is precisely in these circumstances, where a potentially lengthy judicial sentencing enhancement is unmoored from a jury's verdict, that the Sixth Amendment must intercede.

Another argument is that legislatures may "establish legally essential sentencing factors *within limits*—limits crossed when, perhaps, the sentencing factor is a 'tail which wags the dog of the substantive offense.' . . . What this means in operation is that the law must not go *too far*—it must not exceed the judicial estimation of the proper role of the judge." *Id.* at 307 (citation omitted). Rejecting this "too far" standard as overly subjective, manipulable, and unmanageable, the Supreme Court concluded that *Apprendi*'s "bright line rule" applied because it was implausible "that the Framers would have left definition of the scope of jury power up to judges' intuitive sense of how far is *too far*. We think that claim not plausible at all, because the very reason the Framers put a jury-trial guarantee in the Constitution is that they were unwilling to trust government to mark out the role of the jury." *Id.* at 308.

Applied here, section 775.082(10)'s substitution of the judge—and the elimination of the jury—as the fact-finder for enhanced sentencing based on future potential dangerousness—violates *Apprendi*'s bright line rule. *See Apprendi*, 530 U.S. at 490 ("[I]t is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed."). The Legislature intended and clearly stated that every eligible offender with twenty-two sentence points or less faces only the lesser panoply of nonstate punishments, capped at up to one year in county jail. Trial judges have broad discretion to sentence offenders in this category to probation, community control, or up to a year in the county jail. *Id.* at 481 (noting that "judges in this country have long exercised discretion of this nature in imposing sentence *within statutory limits* in the individual case"). For upward enhancements, however, the Legislature clearly stated that only the "court"—not the jury—is authorized to make "written findings that a nonstate prison sanction could present a danger to the public," thereby precluding the jury's traditional role. Only the Legislature, not this Court, has the power to rewrite the statute to conform to the Sixth Amendment.[5]

The use of scoresheets—whose assessment of points draw upon facts found by a jury's verdict, are based on the fact of prior convictions, or are admitted by the offender—complies with *Apprendi* and *Blakely*. *Id.* (stating "that nothing in this [Nation's common law] history suggests that it is impermissible for judges to exercise discretion-taking into consideration various factors relating both to offense and offender-in imposing a judgment *within the range* prescribed by statute"); *see Alleyne v. United States*, 570 U.S. 99, 116 (2013) ("Our ruling today does not mean that any fact that influences judicial discretion must be found by a jury. We have long recognized that broad sentencing discretion, informed by judicial factfinding, does not violate the Sixth Amendment."); *Fleming v. State*, 139 So. 3d 902, 903 (Fla. 1st DCA

---

[5] We agree with the dissent in *Brown*, which was disinclined to rewrite the statute and, instead, would have applied it consistent with the Sixth Amendment principles expressed in *Apprendi*/*Blakely* and their progeny. *See Brown*, 233 So. 3d at 1266-68 (Cohen, C.J., dissenting).

14

2006) (assessment of points for "severe victim injury" did not violate *Apprendi* because jury found defendant guilty of aggravated battery that caused great bodily harm, permanent disability, or permanent disfigurement), *approved*, 61 So. 3d 399 (Fla. 2011); *see also Moss v. Sec'y, Dep't of Corr.*, No. 8:10-cv-1919-T-17TBM, 2011 WL 1575384, at \*1, \*4 (M.D. Fla. Apr. 26, 2011) (noting that "the jury's verdict did not lack the necessary finding to support the scoring of severe injury points on the scoresheet, and neither *Apprendi* nor *Blakely* apply"). The Second District made this point in *Behl v. State*:

> Under the Supreme Court's interpretation of the Sixth Amendment, victim injury thus can be used as a sentencing factor only if its existence is determined by the jury or admitted by the defendant. Accordingly, a guidelines sentence imposed at a level that is only permissible because victim injury points were assessed will exceed the "statutory maximum" for *Apprendi* purposes if the victim injury points were not based on a determination made by the jury or on an admission of the defendant.

898 So. 2d 217, 221 (Fla. 2d DCA 2005) (reversing sentence under *Apprendi* where scoresheet reflected greater points assigned for sexual penetration when only sexual contact could be established by jury's verdict). As such, the use of scoresheets (that must comply with *Apprendi*) to set a statutory maximum does nothing to undermine *Apprendi*'s holding that enhancing a sentence via additional judicial fact-finding violates the Sixth Amendment. It would be an odd and incongruous result otherwise.[6]

---

[6] We disagree with the Fifth District's view that a "jury does not determine an offender's score and will rarely make all of the other scoresheet findings." *Brown*, 233 So. 3d at 1265. Rather, we read Supreme Court precedent and related Florida caselaw as establishing that jury findings *must* undergird the computation of sentence points else they violate the Sixth Amendment as construed by *Apprendi* and *Blakeley* (excepting prior convictions and facts admitted by a defendant).

That is because *Apprendi* and *Blakely* protect the Sixth Amendment's right of jury trial, which:

> is no mere procedural formality, but a fundamental reservation of power in our constitutional structure. Just as suffrage ensures the people's ultimate control in the legislative and executive branches, jury trial is meant to ensure their control in the judiciary. . . . *Apprendi* carries out this design by ensuring that the judge's authority to sentence derives wholly from the jury's verdict. Without that restriction, the jury would not exercise the control that the Framers intended.

*Blakely*, 542 U.S. at 305-06. The last sentence in subsection (10) is inconsistent with this constitutional design, displacing the jury's fundamental role and replacing it with judicial power unyoked from jury control. The jury's role as an equilibrating force between the power of the State and the accused is at its apex when more serious punishments are in play. Viewed in this light, subsection (10) exacerbates an acute Sixth Amendment problem: the jury is relieved of its traditional fact-finding role, but only when enhanced sentences are to be meted out. As applied to Booker, whose punishment was increased exponentially based on additional judicial findings (not even beyond a reasonable doubt), the statute excised the jury's "control in the judiciary" and negated the principle that "the judge's authority to sentence derives wholly from the jury verdict."

That *Apprendi* excludes from jury fact-finding the "fact of a prior conviction" does not save subsection (10)'s constitutionality as applied to Booker. First of all, the "last sentence of subsection (10) is not a violent career criminal statute, a habitual offender statute, or the like that excepts it from *Apprendi*; instead, it establishes a future dangerousness test based on additional fact-finding by a judge." *Woods*, 214 So. 3d at 808 (Makar, J., concurring in affirmance).

> It is one thing to enlarge a penalty where Congress or the State of Florida has made a prior conviction a central feature of a crime; it is another to allow a trial judge to engage in wide-ranging fact-finding—constitutionally

16

entrusted to a jury—about an offender's potential for being a "danger to the public" to support an enhanced penalty. And it is yet another to allow prior convictions, which already underlie the arithmetic determination of points for sentencing scoresheet purposes in Florida, to be used duplicatively to increase a sentence without jury involvement.

*Id.* at 809. Had the Legislature decided that the punishment for an offender like Booker could be increased based solely on the "fact of a prior conviction," it could have done so via a repeat/habitual offender or career criminal type of statute that *Apprendi* and *Blakely* allow. *See, e.g.*, *Almendarez-Torres v. United States*, 523 U.S. 224 (1998). Prior convictions are established facts and thereby objective grounds for these types of legislatively-enhanced sentences that need not be based on independent fact-finding by a jury. Legislatively-enhanced punishment for a repeat or habitual offender based on the historical fact of the offender's *past* convictions differs markedly from a judge—entirely independent of the jury—extrapolating beyond prior convictions and prognosticating about an offender's *future dangerousness*; doing so is a step beyond what *Apprendi* permits. *See Apprendi*, 530 U.S. at 496 (noting that "there is a vast difference between accepting the validity of a prior judgment of conviction entered in a proceeding in which the defendant had the right to a jury trial and the right to require the prosecutor to prove guilt beyond a reasonable doubt, and allowing the judge to find the required fact under a lesser standard of proof").

Second, subsection (10) places no limits on the evidence a trial judge may consider in making the factual finding that an offender may pose a "danger to the public." Many factors other than the fact of prior convictions are germane in determining future dangerousness.

Adjudicating whether an offender "could present a danger to the public" absent a nonstate sanction involves a multitude of factors, only one of which is whether the offender has a criminal record for which a prior conviction is but a data point. *Reed*, 192 So. 3d at 646 (providing a non-exhaustive list of factors including criminal history,

17

victim injury, and propensity for one to commit future crimes). Faced with substantial enhancement of his sentence, no defendant (through effective counsel) would limit the evidentiary review required under subsection (10) to only his prior convictions without presenting other evidence in mitigation.

*Woods*, 214 So. 3d at 808-09 (Makar, J., concurring in affirmance) (footnote omitted). Whether an offender poses a "danger to the public" is a complex factual determination that far exceeds the type of legislatively-defined sentencing systems that increase punishment solely on the fact of prior criminal convictions.

Here, the trial judge had no statutory authority to elevate Booker's sentence to state prison simply because Booker had prior convictions. And he considered matters other than prior convictions as well, such as whether Booker was working, lacked a driver's license, failed to show up for his trial date, wore camouflage overalls to court, and so on, in assessing his future dangerousness. And the sole witness, the investigator from whom Booker had fled, merely recounted the details of Booker eluding her in a motor vehicle, which are only the facts inherent in the crime. *Reed*, 192 So. 3d at 647 (stating that "a sentencing court's finding of an offender's danger to the public must be more than the recitation of acts that are inherent to the crimes for which the defendant was convicted").

As to Booker, the application of subsection (10) in this case went beyond the fact of his prior convictions and resulted in judicial fact-finding—entirely independent of the jury—to impose a sanction that exceeded the relevant maximum sentence for *Apprendi* purposes. Because the trial judge's factual findings—and thereby Booker's enhanced sentence—were neither based on a *jury* finding that he poses a "danger to the public" nor limited to only the *fact* that Booker had prior convictions, the second sentence of subsection (10) is unconstitutional under the Sixth Amendment as applied to Booker.

### *Harmless Error/Remedy*

Two questions remain: harmless error and remedy. The harmless error question asks if the constitutional error in using judge-made findings rather than jury-made findings is harmless beyond a reasonable doubt as applied to Booker's sentencing. If so, our inquiry ends; if not, we turn to the remedy question, which asks, given that the second sentence in subsection (10) is unconstitutional as applied to Booker, what remedy would the Legislature have wanted in resentencing Booker.

As to the first question, both the Supreme Court and our supreme court have held that *Apprendi/Blakely* errors can be harmless. *See Neder v. United States*, 527 U.S. 1, 15 (1999) (noting that the "omission of an element [in a jury instruction] is an error that is subject to harmless-error analysis"); *Plott*, 148 So. 3d at 95 ("A claim of error under *Apprendi* and *Blakely* is subject to a harmless error analysis."); *Galindez v. State*, 955 So. 2d 517, 524 (Fla. 2007) ("[W]e hold that harmless error analysis applies to *Apprendi* and *Blakely* error."); *see also Washington v. Recuenco*, 548 U.S. 212, 220 (2006) (holding that *Blakely* sentencing factor error not structural and thereby subject to harmless error analysis).

The harmless error test announced in *Neder* was adopted by our supreme court in *Galindez*: "Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?" *Neder*, 527 U.S. at 18.

> A reviewing court making this harmless-error inquiry does not, as Justice Traynor put it, "become in effect a second jury to determine whether the defendant is guilty." Rather a court, in typical appellate-court fashion, asks whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element.

*Id.* at 19 (citations omitted). *Neder* involved the omission of an element of a crime, but its analysis has been extended to the sentencing context. *Galindez*, 955 So. 2d at 523 ("[F]or purposes of our harmless error analysis the issue is whether the failure to have

19

the jury make the victim injury finding . . . contributed to the conviction *or sentence*.") (emphasis added) (citing *Recuenco*, 548 U.S. at 220 ("[W]e have treated sentencing factors, like elements, as facts that have to be tried to the jury and proved beyond a reasonable doubt.")). In *Galindez*, for example, the supreme court concluded that the record evidence demonstrated beyond a reasonable doubt that a rational jury (versus the trial judge who imposed additional points towards sentencing) would conclude that the act of sexual penetration occurred, rendering the *Apprendi* error harmless. 955 So. 2d at 523.

As applied to Booker's sentencing in this case, the harmless error test requires that we ask whether there is record evidence "that could rationally lead" a jury to conclude—contrary to the trial court—that Booker did *not* present a danger to the public if he were given a nonstate prison sanction, such as up to a year in county jail plus probation or community control thereafter. If a "reasonable possibility" exists that the error affected the sentencing, such that we're unable to conclude "beyond a reasonable doubt that the error did not affect" sentencing, the "error is by definition harmful." *State v. DiGuilio*, 491 So. 2d 1129, 1139 (Fla. 1986).

Booker is no model citizen, having a significant ongoing criminal record that dates to his youth, and enough sentence points to flirt with the statutory cutoff of 22 points. The nature of Booker's past offenses, his lack of deportment, and his straddling the statutory cutoff make him a less sympathetic offender compared to the homeless mom in *Woods*, who had 8.3 sentence points and was stealing food to feed her kids. Nonetheless, the evidence cannot be said to be so compelling that a rational jury would necessarily conclude that Booker presented a danger to the public if subject to *only* a nonstate prison sanction of up to one year in the county jail coupled with significant community control and probation, which the State sought as an alternative to a state prison sanction. A jury could conclude, as Booker's attorney argued, that his client's offense—fleeing and eluding police officers—coupled with his deportment and record, were insufficient to demonstrate that he posed a continuing threat of danger to the community that justified state prison time. A jury might conclude that a year in county jail followed by significantly

lengthy post-release restrictions would provide adequate protection to the public, relieving the State of the financial burden of incarcerating Booker for that time period. Perhaps most juries would find Booker posed a public danger that justified state prison, but the question is whether any rational one might not and deem county jail and lengthy probation/community control enough. Because it is not "clear beyond a reasonable doubt" that rational juries would always conclude that Booker deserved state prison rather than a nonstate prison sanction, the constitutional error is not harmless.

The next question is what resentencing remedy applies to Booker. Under the circumstances, we ordinarily would invalidate Booker's sentence and simply remand for resentencing under that part of the statute that remains valid, which would be the imposition of a nonstate prison sanction under the authority of the first sentence of subsection (10). But, as the Supreme Court's opinion in *Booker* demonstrates, the remedy in an as-applied constitutional challenge does not necessarily result in this default remedy, i.e., where what remains of a statute is rotely applied.

Instead, the Court in *Booker* was guided in its remedial determination by legislative intent, which focused on the determination of "what 'Congress would have intended' in light of the Court's constitutional holding." *Booker*, 543 U.S. at 246. In other words, "[w]ould Congress still have passed" the valid sections "had it known" about the constitutional invalidity of the other portions of the statute?" *Denver Area Educ. Telecomm. Consortium, Inc. v. FCC,* 518 U.S. 727, 767 (1996) (plurality opinion) (internal quotation marks omitted). Given the constitutional violation in *Booker*, the Court was left with determining which of the competing "remedial approaches is the more compatible with the Legislature's intent as embodied in the 1984 Sentencing Act." 543 U.S. at 246.

This question sharply divided the Court. The majority concluded that severing the mandatory nature of the sentencing guidelines eliminated the constitutional infirmity "while maintaining a strong connection between the sentence imposed and the offender's real conduct—a connection important to the increased uniformity of sentencing that Congress intended its

Guidelines system to achieve." *Id*. Rejected was the dissenters' remedy, which was to engraft a "jury trial" requirement into the sentencing system, thereby "preventing the sentencing court from increasing a sentence on the basis of a fact that the jury did not find (or that the offender did not admit)." *Id*. Both views, of course, had merit, each envisioning the realization of legislative intent differently.

Similarly, we must decide which remedial option the Legislature would have wanted if the last sentence of subsection (10) were to be deemed unconstitutional in its application. The most apparent options are: (a) engrafting a "jury trial" requirement into the last sentence of subsection (10) and remanding for proceedings under a judicially-revised process; (b) construing "must" in the first sentence of subsection (10) to mean "may" thereby making compulsory nonstate prison sanctions non-compulsory and raising the relevant statutory maximum sentence to a state prison term; (c) remanding for resentencing under the first sentence of subsection (10) only; or (d) remanding for resentencing under the prior version of the sentencing statute, i.e., statutory revival.

We reject option (a) for much the same reasons that the Court in *Booker* did: no indication exists that the Legislature would have wanted a judicially-imposed jury trial requirement given the clear language of the statute. To do so would take away the role that the Legislature assigned solely to the judiciary and make more complex and costly a sentencing process it sought to streamline; it may have wanted an impassive judge rather than an impassioned jury deciding the public danger question. Plus, judicially rewriting a statute, thereby creating a different sentencing procedure, risks its own collateral consequences that create known and unforeseen burdens and uncertainties.

Option (b), which is akin to what the majority applied in *Booker*, has the virtue of solving the *Apprendi* problem by completely recasting subsection (10) as an entirely permissive sentencing statute, eliminating compelled nonstate prison sanctions and thereby raising the relevant statutory maximum for *Apprendi* purposes to a five-year maximum. But the principal purpose of the 2009 sentencing revision was to compel judges to

22

sentence offenders to nonstate prison sanctions thereby shifting incarceration costs from the State's prison system to the counties. Were we to construe "must" to mean "may" (or even "should"), we would be turning the raison d'être of the statute into a mere wish or velleity, and thereby impeding the legislative plan. Like *Booker*, which excised a portion of the federal statute to achieve a constitutional result, transforming a clear word of compulsion ("must") into one of permission ("may") may achieve a similar constitutional result, but leaves the lingering question of whether the remedial impact comes close to what the Legislature envisioned. Because we are focused solely on the appropriate remedy in Booker's case, however, we are disinclined to take this momentous step if another less drastic remedy is available as to Booker.

Option (c) is problematic because it would retain only one leg of the two-legged sentencing structure in subsection (10), making the application of severance principles useful. *Booker*, 543 U.S. at 247 ("[S]ometimes severability questions (questions as to how, or whether, Congress would intend a statute to apply) can arise when a legislatively unforeseen constitutional problem requires modification of a statutory provision as applied in a significant number of instances."). The severance test states:

> The rule is well established that the unconstitutionality of a portion of a statute will not necessarily condemn the entire act. When a part of a statute is declared unconstitutional the remainder of the act will be permitted to stand provided: (1) the unconstitutional provisions can be separated from the remaining valid provisions, (2) the legislative purpose expressed in the valid provisions can be accomplished independently of those which are void, (3) the good and the bad features are not so inseparable in substance that it can be said that the Legislature would have passed the one without the other and, (4) an act complete in itself remains after the invalid provisions are stricken.

*Cramp v. Bd. of Pub. Instruction of Orange Cty.*, 137 So. 2d 828, 830 (Fla. 1962); *see also Schmitt v. State*, 590 So. 2d 404, 415 (Fla.

1991) ("The *Cramp* test is a well established component of Florida law. It has been applied repeatedly in countless Florida cases.").

As applied here, factors (1), (2), and (4) are met: the first and second sentences of subsection (10) can be separated, the legislative purpose underlying the valid portion, i.e., the first sentence, can be accomplished without the second sentence; and the first sentence can stand as an "act complete in itself" without the second sentence.

We conclude, however, that "the good and the bad features are not so inseparable in substance that it can be said that the Legislature would have passed the one without the other." *Cramp*, 137 So. 2d at 830.

> The most reasonable conclusion is that the Legislature passed subsection (10) as a unified, inseparable whole and would not have wanted severance of its component parts. Subsection (10) reflects a compromise between two related goals: the fiscal goal of reducing state prison expenses and the public safety goal of ensuring that violent offenders be subject to state prison sentences if nonstate sanctions don't suffice. Striking only the last sentence, which would result in nonstate sentences for all offenders no matter their dangerousness, serves the former goal at the expense of the latter. No indication exists that the Legislature would have down-graded sentences within this classification (from up to five years to nonstate sentences) without the concurrent potential for violent offenders to be placed in the state prison system. Stated differently, it cannot be said that the Legislature would have passed only the first sentence in subsection (10) but not the last; the two are intertwined.

*Woods*, 214 So. 3d at 810 (Makar, J., concurring in affirmance). Because we conclude that severance of subsection (10)'s sentences would run counter to legislative intent, we reject option (c), which would require that Booker be sentenced to a nonstate prison sanction only. The Legislature wanted a safeguard for truly violent offenders to be subject to possible state prison sentences, which this option would not offer.

Given that subsection (10)'s two sentences are inseparable, option (d) presents the remedy of statutory revival, which is to revert to the previous version of the sentencing statute, one that authorized trial judges to impose any term of imprisonment up to five years for the class of offenders to which subsection (10) applied. *See* § 775.082, Fla. Stat. (2008); *see also* Crim. and Civ. Just. Comm. SB 1722 Staff Analysis (discussing the then-current sentencing options); *see generally B.H. v. State*, 645 So. 2d 987, 995 (Fla. 1994) ("Florida law has long held that, when the legislature approves unconstitutional statutory language and simultaneously repeals its predecessor, then the judicial act of striking the new statutory language automatically revives the predecessor unless it, too, would be unconstitutional.").

Like option (b), this remedy would subject Booker on remand to the full range of sentencing options, from a nonstate prison sanction to a state prison sanction, including the four-year prison sentence he received. Conceivably, he might be resentenced to the sentence he currently serves, but that likelihood is uncertain and is no reason to reject this option out of hand. Instead, the sentencing judge would take into account the full range of sentencing factors—not merely the one-dimensional "public danger" inquiry that was the sole focus here—in determining an appropriate sentence for Booker, which could result in a lower sentence or, theoretically, a higher one. The former is more likely given that Booker's current sentence is near the five-year maximum and a higher sentence might trigger vindictive sentencing principles. *See Baxter v. State*, 127 So. 3d 726 (Fla. 1st DCA 2013).

Finally, reverting to the prior sentencing laws as the remedy in Booker's case does less systemic harm than would a potentially far-reaching judicial decree under option (a) (insert "jury" for "court") or option (b) (i.e., that "must" really means "may"). Judicially rewording the statute is inadvisable where a more modest remedy is available as applied to Booker and the small number of offenders similarly situated. That said, trial judges and attorneys prospectively will justifiably wonder what to do in cases where the State seeks to enhance a sentence under the last sentence of subsection (10). Of course, the vast swath of cases will continue to result in nonstate prison sanctions under the first

sentence of subsection (10); but what if an offender is one for whom the Legislature intended potentially enhanced punishment? In those cases, the prosecutor could do as federal prosecutors did post-*Apprendi*, which is to allege facts by information or indictment necessary to establish the basis for an enhanced sentence. *Booker*, 543 U.S. at 277 (Stevens, J., dissenting in part) ("In many cases, prosecutors could avoid an *Apprendi* . . . problem simply by alleging in the indictment the facts necessary to reach the chosen Guidelines sentence."). Doing so may provide the factual basis for a trial judge to pass upon whether a state prison sanction is appropriate. And, although defendants ordinarily have no reason to waive their jury trial right and subject themselves to an enhanced sentence under the second sentence in subsection (10), some might do so in this limited circumstance if they perceive that judicial fact-finding may be more beneficial than jury fact-finding on the facts alleged in the information nor indictment.

### *Conclusion*

Because the last sentence of subsection (10) is unconstitutional as applied to Booker, and the violation is not harmless, the remedy is to invalidate Booker's sentence and remand for resentencing under the prior version of the sentencing statute. Unlike Woods, who had been released from prison after serving her full term and before relief could be granted, *Woods*, 214 So. 3d at 804, Booker remains incarcerated and thereby has a basis for resentencing. His four-year sentence is beyond the relevant statutory maximum under subsection (10) making his current sentence invalid.

We recognize that some of our colleagues view subsection (10) as presenting no Sixth Amendment issue. *Woods*, 214 So. 3d at 812 (Osterhaus, J., concurring in affirmance) (stating that subsection (10) "does not have an *Apprendi*-related, Sixth Amendment problem. *Apprendi* prohibits judicial findings that increase a criminal penalty beyond the maximum authorized by a jury's verdict. Here, § 775.082(10) does not allow courts to increase the punishment, but only affects the form of a defendant's penalty, whether it will include prison time or not."); *id.* at 819 (Winokur, J., concurring). And a majority on Fifth District panel recently upheld the constitutionality of section 775.082(10). *Brown*, 233 So.

3d at 1262-66. For these reasons, and although mandatory jurisdiction in our supreme court exists in this case, art. V, § 3(b)(1), Fla. Const.; *State v. Robinson*, 873 So. 2d 1205, 1207 (Fla. 2004), we certify conflict with *Brown* and *Porter* and certify the following question of great public importance:

> WHETHER THE SECOND SENTENCE IN SUBSECTION (10) OF SECTION 775.082, FLORIDA STATUTES, WHICH AUTHORIZES A TRIAL JUDGE TO MAKE FACTUAL FINDINGS INDEPENDENT OF A JURY AS TO AN OFFENDER'S POTENTIAL "DANGER TO THE PUBLIC" AND TO IMPOSE A STATE PRISON SENTENCE THAT EXCEEDS THE MAXIMUM NONSTATE SANCTION OF UP TO ONE YEAR IN COUNTY JAIL VIOLATES THE SIXTH AMENDMENT AS APPLIED TO BOOKER? IF THE ERROR IS NOT HARMLESS, WHAT REMEDY IS APPROPRIATE?

REVERSED and REMANDED; CONFLICT CERTIFIED; QUESTION OF GREAT PUBLIC IMPORTANCE CERTIFIED.

ROBERTS, J., concurs; JAY, J., concurs in part and dissents in part with opinion.

---

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

---

JAY, J., concurring in part and dissenting in part.

I concur insofar as the majority concludes that the trial court's imposition of a prison sentence under section 775.082(10), Florida Statutes, is unconstitutional under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Blakely v. Washington*, 542 U.S. 296 (2004). However, I would find that section 775.082(10) is unconstitutional on its face for the reasons outlined in Judge Makar's concurring opinion in *Woods v. State*, 214 So. 3d 803, 805-09 (Fla. 1st DCA 2017).

27

Furthermore, I would conclude that the sentencing error in this case is harmless because the proper remedy is to sentence Booker under the prior version of the statute, which gives the trial court unfettered discretion to sentence Booker up to the statutory maximum of five years in prison. I find it inconceivable that the court would sentence Booker to a lesser sentence than four years in prison under a statute that gives it even greater discretion to impose a prison sentence. To the extent the court might consider a longer sentence, this could raise concerns about vindictive sentencing. Because I conclude beyond a reasonable doubt that the trial court would impose the same sentence at resentencing, I dissent to the extent the majority remands for a new sentencing hearing.

_____

Andy Thomas, Public Defender, Tallahassee, for Appellant.

Pamela Jo Bondi, Attorney General, Robert Quentin Humphrey, Assistant Attorney General, Tallahassee, for Appellee.